Filed 12/19/25  P. v. Lopez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN ABOYTES LOPEZ, JR.,<br><br>    Defendant and Appellant. | H050837<br>(Santa Cruz County<br> Super. Ct. No. CR2086) |

Convicted of murder in 1990, defendant Juan Aboytes Lopez, Jr. petitioned for resentencing under what is now Penal Code section 1172.6.[1]  After this court reversed the summary denial of his petition, the trial court held an evidentiary hearing and denied the petition again.  On this second appeal, we reject Lopez's claim that the evidence was insufficient to support the trial court's determination that he is guilty of aiding and abetting implied malice murder.  But we agree that Lopez was prejudiced by his counsel's failure to raise the relevance of Lopez's youth to the mental state necessary to convict him under current law.  We reverse.[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] Lopez petitioned this court for writ of habeas corpus, which we ordered considered with this appeal.  We have denied the petition by separate order filed this day (H052754).

# I. BACKGROUND

## A. *Lopez's Conviction, the Preliminary Hearing, and the Parole Board Hearings*

Luis Sandoval was killed in front of the Watsonville Public Library on November 2, 1988. The Santa Cruz County District Attorney charged Lopez with murder (§ 187). After the trial court rejected a plea agreement, a jury found Lopez guilty of second degree murder. In 1990, the court sentenced Lopez to 15 years to life in prison.

The transcripts from Lopez's jury trial have been destroyed. But the transcripts of his preliminary hearing, held in 1989, were included in the record. So were the transcripts of four parole board hearings.

### 1. *The Preliminary Hearing*

#### a. *Eyewitness Testimony*

Jose Gomez was walking with Sandoval on Main Street in Watsonville on November 2, 1988. While Gomez and Sandoval were in the crosswalk, the driver of a moving car with three or four occupants shouted, " 'Poor Side,' " waved a blue bandana out the window, and "[t]hrew a P"—a hand gesture signaling affiliation with Watsonville's Poor Side gang. Sandoval ran after the car but stopped when another car nearly hit him. Gomez and Sandoval walked to the library.

About 15 to 30 minutes later, Gomez was standing with Sandoval outside the library when he saw the same car approach. Someone in the car shot Sandoval, killing him.

#### b. *Coroner's Testimony*

According to the forensic pathologist who performed Sandoval's autopsy, Sandoval died from pellet wounds to the chest and abdomen, wounding his heart and lungs. The pellets appeared to be "number seven and a half shot." Based on the 18-inch cluster of the majority of the pellet strikes between Sandoval's collarbone and midabdomen, without knowing the choke on the barrel or the shell that was used, the

pathologist estimated the shot was fired from a distance of what "has to be 30 feet, or a little greater" and agreed that it could have been fired from as much as 50 feet.[3]

### c. *Lopez's Statements to Law Enforcement*

Later that day, Lopez's mother hailed a marked patrol vehicle at her home, expressing concern that someone wanted to kill her sons because they had gotten into a fight in which someone had been hurt. Lopez, then 20 years old, exited the house and told law enforcement that he had been the driver and " 'the other guy' " shot Sandoval, while Lopez's brother was in the back seat.

Lopez agreed to be interviewed and, at the police station, waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. He told law enforcement that he had been driving Emilio Rocha's car down Main Street when Rocha, in the passenger seat, saw Sandoval. Lopez was on friendly terms with Sandoval and had worked on Sandoval's car. But Rocha and Sandoval had a disagreement. Rocha pulled out a shotgun and shot Sandoval. Lopez said the shooting happened so fast that he could do nothing to stop it. After the shooting, Lopez dropped Rocha and his brother off to hide the gun and for Rocha to prepare to flee the country.

### d. *Gang Expert Testimony*

The main gangs in Watsonville at the time were Poor Side, North Side, and City Hall. North Side and City Hall shared the color red. Poor Side's color was blue.

Sandoval was a North Side member, with identifying tattoos. Gomez was affiliated with the City Hall gang. The library was a known hangout for the City Hall gang.

---

[3] The pathologist explained that properly estimating the distance would require determining the shotgun's "true pattern" with the actual firearm, any choke ("any constriction in the muzzle or the design to make the pattern tighter"), and comparable shotgun cartridges "because some of them are made quite differently."

An officer opined that Lopez was at least affiliated with Poor Side based on the people he associated with and where he spent his time. Flaunting a Poor Side gang affiliation in the face of opposing gang members would generate "a very possible potential for . . . violence."

### 2. *The 1997 Parole Board Hearing*

At his first parole hearing in 1997, Lopez testified that he was involved in Sandoval's killing as the driver. Lopez, then 20 years old, was driving with Rocha, then about 18 years old, in the front passenger seat and Lopez's brother, then about 16 or 17 years old, in the back seat. When passing Sandoval on Main Street, Rocha and Sandoval said "[a] lot of things" to each other: The two had fought before and were members of opposing gangs. Lopez was also a gang member. When two people initially pursued the car on foot, Lopez stopped and along with at least one other occupant got out of the car to fight. When one of the car's occupants brandished a shotgun, the pursuers ran away.

After an interlude at a gas station, Lopez drove the car back to fight the former pursuers, knowing that his "crime partner" had a shotgun and was going to "use" it. Lopez said that he was surprised "[a]t first" that Rocha had a shotgun, because it "came out of nowhere." But when they found Sandoval, the shotgun was already in the front passenger seat. Sandoval ran towards the car with a "little stick." Sandoval began backing up when Rocha pulled the shotgun out. Rocha shot Sandoval from inside the car.

The board denied parole, instructing Lopez to develop "a better understanding of why you got yourself involved in such a mess in the first place" while praising his "candor" in describing "how it went down."

### 3. *The 2010 Parole Board Hearing*

At his second parole hearing, Lopez explained that he and his brother were Poor Side associates at the time of the killing, while Rocha was a full Poor Side gang member.

Lopez was driving the car with his "crime partner" and flashed a gang sign. Lopez first learned of the shotgun when Rocha pulled it from the back seat.

Lopez, who described himself as "a young, little, wild kid" "mind-wise," made a "[d]umb choice" not to "just take off and leave and not come back." Instead, after stopping at a gas station, he drove Rocha to find Sandoval, while Rocha had the shotgun in his lap. Rocha shot and killed Sandoval for a gang-related grudge after Sandoval beat Rocha in a fight weeks earlier.

Lopez first stated that he did not know what Rocha intended to do when they found Sandoval. But when pressed with compound and leading questions, Lopez agreed that he pulled over and stopped so Rocha could shoot Sandoval. Lopez said that his plan was only to beat Sandoval up, killing Sandoval was not planned. Once again pressed, Lopez said that Sandoval "could have got shot in the leg" before again taking "full responsibility for the murder that happened." Asked whether he thought he would get caught when he "participated in committing the murder," Lopez said that he "wasn't even thinking, to be honest with you. I wasn't — It didn't even cross my mind."

The board denied parole, instructing Lopez to "explore in great detail why [he was] involved in this commitment offense," the "causative factors," and his "mindset at the time." Opining that Lopez "kn[e]w in [his] heart why that victim got shot," the board instructed Lopez to "provide future Boards a *reasonable* account of how this commitment offense occurred in [his] mind and have a clear understanding of the causative factors of [his] conduct." (Italics added.) The board told Lopez to "*fully* take responsibility for what you've done by just putting it out there. Yes, I did this. Yes, I did that." (Italics added.)

### 4. *The 2015 Parole Board Hearing*

At his third parole hearing, Lopez testified that, as a gang member from the age of 14 to the age of 20, Lopez participated in about 10 fistfights and four or five shootings.

In the four or five shootings he participated in, he was mostly "the driver or participator." As far as he knew, nobody was injured in any of the prior shootings.

On the day of the shooting, Rocha's shotgun was in the back seat; it was there "[t]o commit crimes."

While driving, they came across Sandoval and Gomez, whom Lopez knew as rival gang members they had "problems" with in the past. Sandoval and Gomez started to disrespect them, so the group in the car responded in kind. When Sandoval and Gomez ran after the car, Lopez pulled over and Rocha drew the shotgun, putting a round in it. Seeing the shotgun, Sandoval and Gomez ran the other way.

To make Sandoval and Gomez "respect" them, the three got back in the car, and Lopez drove to the library to find Sandoval and Gomez. Rocha kept the shotgun in his lap. At the library, they found Sandoval and Gomez in front with two girls. When Lopez stopped the car, Sandoval stepped forward, and Rocha shot him.

Lopez explained that Sandoval was killed because of a "grudge with all of us." And Lopez felt he had been confronted and did not "want to seem weak." Lopez accepted responsibility "for taking [Sandoval's] life because [he] was in control of the vehicle" and made the "irresponsible" decision not to turn the vehicle around.

The board denied parole, finding that Lopez was not credible and continued to demonstrate a "gang mentality." Although Lopez claimed to "take responsibility" for the crime, Lopez needed to come to terms with how his "own negative characteristics . . . made [him] do the things that [he] did" as "the driver[,] . . . the oldest guy," a person taking a "leadership role," and the one that "had a grudge with the victim."

### 5. *The 2016 Parole Board Hearing*

As his fourth parole hearing, Lopez testified that he put "everything into motion that day" by taking "leadership" in the confrontation with Sandoval, whom he "hated" as a rival gang member. Specifically, Lopez testified that after Rocha initially scared off Sandoval and Gomez with the shotgun, Lopez urged, "[L]et's go get him, enough is

6

enough." This was because Sandoval had disrespected their gang too much and had recently jumped Rocha.

**B.** *The Petition, First Evidentiary Hearing, and Reversal*

Lopez petitioned for resentencing in 2020. Lopez alleged that he was convicted of second degree murder under a natural and probable consequences theory or the felony murder doctrine and could no longer be convicted of murder.

In a 2021 evidentiary hearing, the trial court granted judicial notice "of the entire record of the case." The court heard testimony from one witness, an expert called by Lopez who opined that prisoners with life sentences modulate their testimony to the parole board as they gain experience from prison programs, word of mouth, or unsuccessful parole hearings. Specifically, the expert testified that a person must take a high level of responsibility for the crime, extending to "every second of the day of the crime" and potentially "more than what were someone's literal actions." Lopez argued that his testimony to the parole board was not probative.

The trial court denied Lopez's petition, finding beyond a reasonable doubt that Lopez was a major participant who acted with reckless indifference to human life.

We reversed, accepting the Attorney General's concession that the trial court had improperly relied on a theory of first degree felony murder, when at trial the prosecution had not argued felony murder, the trial court had not instructed the jury on felony murder, and Lopez was convicted of second degree murder. (See *People v. Lopez* (July 15, 2022, H049158) [nonpub. opn.].) This court remanded for a determination, "with or without further evidentiary hearing, whether Lopez is guilty beyond a reasonable doubt of second degree murder under a currently valid theory of liability."

**C.** *The Second Evidentiary Hearing and Present Appeal*

On remand, a different trial judge took judicial notice of the preliminary hearing transcripts, the parole hearing transcripts, the procedural history recited in the appellate opinion addressing Lopez's appeal from the conviction, all (existing) documents

7

associated with the jury trial, the appeal files in case number H007747, and the trial court files in case number CR2080.[4]  In a written order, the court explained that its factual findings were based "on only the preliminary hearing transcript (given that the preliminary hearing predated Proposition 115 [as approved by voters, Primary Elec. (June 5, 1990)]), Lopez's sworn statements at parole hearings, and the transcript of the 2021 resentencing hearing."

The trial court found that Lopez drove Rocha to shoot Sandoval with a loaded shotgun knowing that shooting Sandoval would endanger Sandoval's life.  So the court found, "beyond a reasonable doubt, that Lopez knew that Rocha intended to commit a life-endangering act, that Lopez intended to aid Rocha in the commission of that act, that Lopez knew the act was dangerous to life, and that Lopez disregarded that risk."  The court denied Lopez's petition.

Lopez timely appealed.

## II.    DISCUSSION

At the second hearing on Lopez's petition, the prosecution bore the burden to prove, beyond a reasonable doubt, that Lopez is guilty of murder under current California law.  (See § 1172.6, subd. (d)(3); *People v. Gonzalez* (2023) 87 Cal.App.5th 869, 880–881.)  " '[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is

---

[4] On August 30, 2023, Lopez applied to augment the record with certain documents from the trial court file.  On September 8, 2023, after the Attorney General objected on completeness grounds, Lopez applied for augmentation with additional documents from the trial court file.  The Attorney General did not object to the second request.  We deemed both of Lopez's applications requests for judicial notice, and now grant the September 8, 2023 request for judicial notice.  We deny the August 30, 2023 request for judicial notice as moot, because the documents therein are also in the later request.

8

knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*People v. Reyes* (2023) 14 Cal.5th 981, 991 (*Reyes*), quoting *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713.) Here, where "the life-endangering act was the shooting, the trial court [was required to ask] whether [Lopez] knew that [Rocha] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (See *Reyes*, at p. 992.)

Nothing in the record suggests the trial court misunderstood the elements of aiding and abetting an implied malice murder. Indeed, Lopez relies primarily on the record's silence as to points he argues for the first time on appeal, and we presume that the trial court was aware of existing law. But we can conceive of no tactical justification for trial counsel's failure to argue Lopez's youth as a factor relevant to his mental state, including whether he acted with conscious disregard for life: It was the responsibility of Lopez's counsel to make these arguments, not the trial court's to anticipate them. And given the specific circumstances of this shooting and Lopez's actions in its wake, we discern a reasonable probability of a more favorable result but for counsel's deficient performance.

## A.    *Sufficiency of the Evidence*

We review the trial court's denial of Lopez's section 1172.6 petition for substantial evidence. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, at p. 988.)

9

Anticipating the difficulty of a substantial evidence challenge on this record, Lopez contends that "[t]he trial court . . . misunderstood or misidentified the life-endangering act as that of Lopez merely driving Rocha and failed to distinguish the import of shooting *at* a person instead of shooting generally" and misunderstood the mental state required to convict Lopez of aiding and abetting an implied malice murder under current law. Not so: The trial court in its written order correctly identified Rocha's life-endangering act (shooting Sandoval), Lopez's conduct that aided Rocha's commission of the life-endangering act ("driving Rocha to shoot Sandoval"), and the required mental state (knowledge of the danger to life and disregard of that known risk). We have no basis to doubt that the trial court understood the elements of the applicable offense.[5]

Building on his legal arguments, Lopez contends that the record lacks substantial evidence that the life-endangering act created a high probability of death or that he aided and abetted implied malice murder with the requisite mental state. We disagree.

### 1. *High Probability of Death*

"To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The *Reyes* court articulated the high degree of probability standard in explaining the act necessary to the actual killer's liability for implied malice murder. (*Id*. at pp. 988–990.) The court discussed aiding and abetting an implied malice murder separately, explaining

---

[5] The trial court entered its order before the Supreme Court issued its opinion in *Reyes*, *supra*, 14 Cal.5th 981. But nothing in the trial court's analysis was inconsistent with *Reyes*.

10

that the act necessary to impose aiding and abetting liability is aiding the actual killer's commission of the life-endangering act. (*Id*. at pp. 990–991.)[6]

The life-endangering act here was Rocha's firing at Sandoval with a shotgun.[7] There is substantial evidence that Rocha's firing the shotgun at Sandoval involved a high probability of resulting in death. It is undisputed that Rocha shot Sandoval in the chest from relatively close range as Lopez drove Rocha still closer to the library. The deadly potential of the act is evident from the coroner's testimony that shotgun pellets fatally wounded Sandoval's heart and lungs.[8] Although the resentencing record lacks specific information about the number, mass, or composition of the pellets in the cartridge Rocha fired, nothing in the record before us supplies a basis to conclude Sandoval's death from the shotgun blast was less than highly probable, to an objective observer. To the extent Lopez could have disputed the probability of death from firing pellets of this shot size rather than a slug or a bullet, he did not; the trial court accordingly had no duty to independently question that probability on this record.

---

[6] To the extent Lopez interprets *Reyes* to provide that Lopez can only be liable for aiding and abetting an implied malice murder if Lopez's conduct *by itself* involved a high degree of probability that it will result in death, we disagree.

[7] Despite his proper identification elsewhere of the life-endangering act, in service of this argument Lopez defines the life-endangering act as driving Rocha. Lopez maintains that it was impossible for him to know if he would be able to find Sandoval, if Rocha would shoot at Sandoval if they found him, and how Rocha would aim his shot if he fired. His argument collapses the distinction between Lopez's act, Rocha's life-endangering act, and Lopez's intent. In this section, we address only whether Rocha's act of shooting Sandoval posed a high probability of death.

[8] Relying on *Reyes*, *supra*, 14 Cal.5th 981, Lopez faults the trial court for not discussing whether Rocha's shooting Sandoval had a high degree of probability of resulting in death. But in the trial court, Lopez did not dispute the probable lethality of Rocha's act, and the Supreme Court in *Reyes* imposed no requirement that trial courts couch their rulings in specific talismanic language. Moreover, the trial court did note the evidence that Sandoval had been shot in the chest and abdomen from about 30 to 50 feet away and concluded that Lopez aided Rocha's commission of a life-endangering act.

11

## 2.     *Lopez's Mental State*

Lopez contends that the record lacks substantial evidence that he knew Rocha was going to shoot at Sandoval, that he intended to assist Rocha in shooting Sandoval, or that he acted with conscious disregard for life.  We disagree.

Consistent with *Reyes*, the trial court assessed whether Lopez knew that Rocha intended to shoot at Sandoval, "intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life."  (See *Reyes*, *supra*, 14 Cal.5th at p. 992.)  The court's findings on these issues, adverse to Lopez, are supported by substantial evidence.

From Lopez's interview with law enforcement in 1988 through his testimony at the 2016 parole hearing, he has consistently acknowledged the following facts:  (1) Lopez was driving a car when one or more occupants exchanged vitriol with Sandoval after which Sandoval fled; (2) knowing that Rocha had a shotgun, Lopez drove Rocha to Sandoval; and (3) Rocha shot Sandoval.  That being so, Lopez has consistently admitted that he aided the shooting.  But he can only be liable for aiding and abetting the shooting if he knew Rocha intended to shoot Sandoval, intended to aid Rocha in shooting Sandoval, knew that shooting Sandoval was dangerous to human life, and acted in conscious disregard for human life.  (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Lopez's admissions about his mental state during parole hearings supply substantial evidence that Lopez harbored a culpable mental state.[9]  In 1997, Lopez testified that he drove the car back to fight Sandoval knowing that Rocha had a shotgun and was going to "use" it.  In 2010, Lopez testified that he did "know what was going to happen" and took responsibility.  In 2015, Lopez testified that Sandoval was killed

---

[9] We acknowledge the availability of less inculpatory interpretations of this evidence.  But on direct appeal, Lopez does not challenge the admissibility or voluntariness of his testimony to the parole board, and we express no opinion on this mixed question of law and fact.

because of a grudge with all the occupants in the car. In 2016, Lopez testified that he played a leadership role and pursued Sandoval with Rocha armed with a shotgun because Sandoval, whom he hated, had been too disrespectful and had jumped Rocha previously. This adverse testimony, which the trial court credited, considered against the backdrop of Lopez's undisputed conduct provides sufficient support for the trial court's determination that Lopez knew Rocha intended to shoot Sandoval, intended to aid Rocha in shooting Sandoval, knew that shooting Sandoval was dangerous to human life, and acted in conscious disregard for human life.

We recognize that Lopez never plainly stated that he wanted or expected Rocha to shoot Sandoval.[10] And Lopez has over the years denied knowing that Rocha intended to shoot Sandoval and insisted that the physical confrontation he intended fell short of a shooting.[11] But whether to credit Lopez's more incriminating or more exculpatory statements is fundamentally a matter conferred to the sound discretion of the trier of fact. Considering all contextual factors, including the events that played out in 1988 and Lopez's incentives to modulate his statements, Lopez's inconsistencies do not render his incriminating statements insubstantial. (See generally *People v. Clements* (2022) 75 Cal.App.5th 276, 298 [explaining both that while substantial evidence must be

---

[10] Lopez maintains that the intended "use" of the shotgun he admitted knowing of in 1997 might not have been to shoot at Sandoval and that his admission about " 'get[ting]' " Sandoval and making " 'them respect us' " might only have referred to a beating.

[11] For example: (1) in 1988, Lopez told law enforcement he did not believe Sandoval was at the library when he drove past it; (2) in 2010, Lopez testified he did not know what was going to happen, that his plan was only to beat up Sandoval, that Sandoval could have instead been shot in the leg, and that Lopez " 'wasn't even thinking' " when he participated in the killing; and (3) in 2015 and 2016 Lopez accepted responsibility for driving Rocha with a shotgun to Sandoval, rather than for intending that Rocha shoot Sandoval.

" ' "credible" ' " it may be "contradicted or uncontradicted" and that "the trial judge's job" is to "make determinations as to credibility"].)

Lopez argues that there is no substantial evidence that he knew Rocha was going to shoot at Sandoval because events could have played out differently: Sandoval might not have been found or might not have run toward the car, or Rocha might have held his fire or aimed differently. But Lopez's parole hearing testimony reflects that he drove to Sandoval with Rocha armed with a shotgun, stopping the car so that Rocha could take his shot—his participation did not end when they found Sandoval.

Lopez's reliance on various mitigating or disputed facts in the record amounts to no more than an invitation to reweigh the evidence, contrary to our review for bare sufficiency. As we will explain with respect to Lopez's claim of ineffective assistance of counsel, a reasonable fact finder could have drawn very different inferences than the trial court did here. But Lopez's arguments do not detract from the substantial evidence supporting this trial court's belief that Lopez knew that Rocha was going to shoot at Sandoval and, with that knowledge, drove Rocha to Sandoval's expected location, intending to assist Rocha in the shooting, and did so with conscious disregard for life.

**B.** *Youth*

Although sufficient evidence supports the trial court's denial of relief, recent appellate cases have held that youth—"defined, roughly, as being 25 years of age and younger"—"is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability." (*People v. Pittman* (2023) 96 Cal.App.5th 400, 416, 417 (*Pittman*).) The *Pittman* court extended the principle— first applied to felony murder's " 'reckless indifference to human life' standard" in cases predating the latest denial of Lopez's resentencing petition—to the "conscious disregard for human life" required for aiding and abetting an implied malice murder. (*Id.* at p. 417; see also *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1003–1004 (*Jimenez*).) The *Pittman* court explained that both mental states share a subjective component: To be

liable under current law, the defendant must subjectively appreciate the risk of death. (*Pittman*, at p. 417.)  Youth is particularly relevant to this inquiry in " 'two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.' [Citation.]  ' "[Transient rashness," ' ' ' " 'impetuosity,' " ' and ' " 'failure to appreciate risks and consequences' " ' are hallmarks of an immature brain." (*Id*. at p. 418.)

Lopez contends that his trial counsel rendered prejudicial ineffective assistance by failing to argue that youthful factors prevented Lopez from subjectively appreciating the risk involved in driving Rocha to Sandoval while Rocha was armed with a shotgun. (*People v. Foley* (2023) 97 Cal.App.5th 653, 659–660 [holding that U.S. Const., 6th Amend. right to counsel applies to the evidentiary hearing on a § 1172.6 petition]; see also *People v. Grajeda* (2025) 111 Cal.App.5th 829, 838 [holding that U.S. Const., 6th Amend., the due process clause, or both create constitutional right to the effective assistance of counsel at a resentencing hearing under § 1172.75]; cf. *People v. Lewis* (2021) 11 Cal.5th 952, 973 [holding that "at the outset of the . . . petitioning process" before stating a prima facie case for resentencing relief, the right to counsel is only statutory, but allowing that it may become a requisite of due process once an evidentiary hearing is warranted].)  To prevail on a claim of ineffective assistance, Lopez must establish both that his counsel's performance was deficient and that the deficiency prejudiced him.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); see also *Grajeda*, at p. 841 [applying *Strickland* without deciding whether constitutional right to counsel flowed from the U.S. Const., 6th Amend. or the due process clause].)  To show deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Strickland*, at p. 688.)  And to establish prejudice, he "must show that there is a reasonable probability"—"a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id.* at p. 694.)

15

As the parties agree, Lopez did not ask the court to consider his youth in assessing his mental state and the trial court did not expressly consider it.[12]  On direct appeal, if " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," ' " we will reject the claim " ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' "  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; see also *People v. Mai* (2013) 57 Cal.4th 986, 1009.)

*Pittman* demonstrates that, at least by the time of the evidentiary hearing, counsel had legal grounds to argue that Lopez's youth was relevant to his mental state.  (*Pittman*, *supra*, 96 Cal.App.5th at pp. 416–417.)  While there may in another case be a tactical justification to refrain from arguing that a client's youth bears on implied malice or conscious disregard, we are satisfied that the failure to broach the issue, on this record, fell below an objective standard of reasonableness:  There can be no satisfactory explanation for the failure to raise the issue given the circumstances of the offense, Lopez's conduct in its aftermath, Lopez's statements to the parole board, and the other arguments counsel raised on Lopez's behalf in support of resentencing.

Lopez was 20 years old when he participated in a gang confrontation that quickly escalated from a passing exchange of words and gestures to a fatal gunshot.  While the actual shooter prepared to flee the country, Lopez voluntarily confessed to his mother and then to police.  There was evidence that Lopez was heedless of the logical consequences of his actions when he drove Rocha to Sandoval, knowing Rocha was armed:  Lopez said as much during a parole hearing and to police.  The crux of Lopez's resentencing petition was his contention that, given the totality of the circumstances, the prosecution could not

---

[12] Trial counsel mentioned Lopez's age at the time of the offense only as it related to (1) what the phrase " 'let's go get him,' " as described in Lopez's final parole hearing, might mean and (2) the parole board's consideration of Lopez's age relative to the other occupants in the car and its obligation to consider his youth.

16

prove malice beyond a reasonable doubt under current law.  Arguments predicated on Lopez's youth would dovetail with Lopez's core contention that he failed to appreciate the escalating stakes.  Nor would the argument have undermined any arguments that counsel did advance on Lopez's behalf.  The failure to argue the relevance of Lopez's youth, in this context, is materially different from a failure to object to apparent errors in the heat of trial, or an election to pursue one among potentially conflicting defense theories.

The Attorney General posits that trial counsel's failure to argue youthful factors can be satisfactorily explained as a strategic decision to either (1) avoid contradicting Lopez's testimony to the parole board, or (2) emphasize that Lopez's adverse testimony to the parole board was incredible, to the extent that testimony might undermine the relevance of youthful factors.  Consistent with the second argument, trial counsel challenged the credibility of admissions Lopez made during parole hearings.  But youthful factors were relevant both to disputing the credibility of unfavorable parole board testimony and in evaluating Lopez's mental state whatever other testimony was credited.  The omitted argument would only have supported the credibility challenge.  Nor do trial counsel's passing references to Lopez's youth, in which counsel failed to identify the hallmark features of youth or the connection between those features and the mental state required for conviction, indicate that counsel made a strategic decision not to raise the issue.  Like us, the Attorney General cannot identify any satisfactory explanation for the failure to argue the relationship between youthful factors and Lopez's mental state.

Lopez, 20, participated in the attack on Sandoval with two peers.[13]  There was no evidence that any attack was planned before the first impromptu confrontation on Main

---

[13] Despite his own statements to the parole board that he was older than his cohorts, Lopez relies on a 2010 newspaper article and his counsel's statement at the 2016 parole hearing to argue that Rocha may have been five years his senior.  Whatever their

Street.  Rather, Rocha's shooting of Sandoval followed two successive public encounters between the two rival gang members; each was accompanied by peers, and each made a point of demonstrating not merely an unwillingness to retreat but an impulse to escalate both verbally and physically.  A lethally escalating confrontation between young rivals in the presence of their young partisans and eyewitnesses presents the quintessential case where reasoned argument marshalling facts and law could have persuaded a reasonable trier of fact that " 'relative impulsivity' . . . 'vulnerability to peer pressure,' "  [Citation.] " ' "[t]ransient rashness," ' ' " 'impetuosity,' " ' and ' " 'failure to appreciate risks and consequences' " ' " (*Pittman*, *supra*, 96 Cal.App.5th p. 418)—left a reasonable doubt as to Lopez's mental state.

A reasonable fact finder could thus conclude that Lopez's youth in such circumstances supplied reason to doubt his subjective appreciation that a further confrontation, or even Rocha's firing the pellets, would be life endangering.

There is also evidence that Lopez "could have been 'swept up in circumstances' beyond his control." (*Jimenez*, *supra*, 103 Cal.App.5th at p. 1008.)  During his parole hearings, Lopez explained that Rocha killed Sandoval not only because of their rival gang membership or verbal altercation but because Sandoval had jumped Rocha weeks earlier. On the day of the shooting, Lopez told law enforcement that Rocha said " 'fuck you' " when Rocha fired.  The evidence that Lopez shared Rocha's grudge, or understood its intensity, is weaker.  And Lopez promptly confessed his involvement to his mother, once he was separated from Rocha.  This resort to parental authority could support an

---

relative ages, both were youthful offenders.  Rocha being older might support an argument that Lopez was more heedlessly susceptible to Rocha's influence.  (Cf. *Jimenez*, *supra*, 103 Cal.App.5th at p. 1007 [discussing influence of new girlfriend].) Rocha being younger might support an inference that Rocha's own impulsivity made his lethal shooting of Sandoval unpredictable.  Indeed, Pittman, at 21, participated in an attack with peers who were 16 and 17, respectively, and yet his seniority did not foreclose reversal.  (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.)

18

inference that Lopez's acts had produced consequences he failed to foresee. His unquestioning cooperation with law enforcement—implicating both himself and Rocha—likewise could reasonably be found to undermine an inference that Lopez set out to assist in a shooting he understood could be lethal.

The Attorney General notes that the attack in this case was different from the attack in *Pittman*. But transient rashness, impetuosity, and failure to appreciate consequences can manifest differently in different circumstances. While there is ample evidence for the Attorney General's characterization of Lopez as a mere Poor Side associate who sought respect from actual Poor Side members like Rocha, here there is only a tenuous connection between Lopez's desire for respect, on the one hand, and an intent that Rocha shoot at Sandoval in a manner that Lopez subjectively appreciated would be dangerous to human life.

As we have explained, the evidence is sufficient to support an inference that Lopez formed the requisite mental state notwithstanding his youth. But in our prejudice inquiry under *Strickland*, we examine whether a more favorable result is reasonably probable absent counsel's error, not whether this more favorable result would have been compelled as a matter of law. Lopez's youth could reasonably have inflected the weight given to the conflicting evidence in the record, including Lopez's own conflicting statements.

And the record does not demonstrate that the trial court independently accounted for Lopez's age notwithstanding trial counsel's failure to raise the issue. When the court ruled, there were felony murder cases from which one could argue by analogy that youth was a relevant factor in assessing culpability for aiding and abetting an implied malice murder, but there was no published appellate authority upholding such an argument. (*Jimenez*, *supra*, 103 Cal.App.5th at pp. 1001–1004 [discussing context in which *Pittman* was decided].) The trial court did not mention Lopez's age in its otherwise comprehensive ruling. So we will not assume that the trial court, unsolicited, implicitly considered Lopez's youth. (See *Pittman*, *supra*, 96 Cal.App.5th at p. 417.)

19

We accordingly discern a reasonable probability of a result more favorable to Lopez had trial counsel argued existing facts and law relevant to Lopez's youth in disputing implied malice under current law.

## III.    DISPOSITION

The February 27, 2023 order denying Lopez's petition for resentencing is reversed.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P. J.


_____
GROVER, J.


*People v. Lopez, Jr.*
H050837